Good afternoon. We do have a third panel member. It is Justice Zinoff. However, she was taken to the hospital last night with possible pneumonia. So when she feels better, and we hope that soon, she will listen to the oral and we will contact her. So that could, I'm not saying it will necessarily delay the issue, but Justice Zinoff is a little bit like the Ever Ready Bunny in a lot of people's eyes. But we'll have to wait for her to get better. So Mr. Rogers, if you're ready, you may proceed. Thank you, Your Honor. Good afternoon. May it please the court, counsel. As you know, there are two issues in this case. The first issue is the question of whether Sandra Rogers got a fair trial, where her trial attorney made two critical errors of omission that bolstered the credibility of the state's star witness. The second issue is whether the trial court violated Section 5-5-4A of the Code of Corrections by imposing a sentence for the attempted murder charges that was more than 50% increase than what she received after she originally pled guilty. Didn't Mr. McMeekin testify more than once, or wasn't he brought into a situation where he had to either say, yes, I lied, or when asked, did you lie, he said yes? Well, he only testified once. He made four statements. I'm talking about on direct, cross-exam, and redirect. Right. He made four pre-trial statements, all written. The first three, none of them implicated the defendant. He indicated the act of the law. The fourth statement, he implicated the defendant once for the first time, and he said that the first three were false. The fourth one was true. He told that to the jury. So he disavowed his first three, and he affirmed his fourth statement, and he essentially told the jury that he was testifying essentially the same as what he was in his fourth statement. So he did admit to the jury that he claimed to the jury that his first three statements were lies, and that his fourth statement was true. The problem is, what the trial defense counsel failed to do was to show that McMeekin had a very strong incentive to testify falsely against the defendant in the trial. That came out in other ways, didn't it? I don't think it really did, Your Honor. It came out that he had made false, that he admitted making the three first, that the first three statements were false. So the jury knew that there were three previous statements that did not implicate the defendant. So if you focus on the fourth statement, which is what McMeekin locked himself into, and the state basically locked him into that, which is standard practice when they had a plea guilty, he made the fourth statement after entering a proffer agreement which said that if he deviated from the statement, he could be charged with perjury. And when he later, about ten days later, entered a guilty plea, part one of the terms of the plea agreement was that he testified truthfully against the defendant. So the implication is that his fourth statement was the truth, and that when he told the jury that his testimony was consistent with the fourth statement, that they should believe him because that was the truth. In closing argument, the state said that McMeekin had nothing to gain by lying. And frankly, Your Honor, when I read that, I immediately thought, that's not true. There should be no objection. He had already pled guilty, correct? He had pled guilty, but this is what was missing. This is what the defense counsel didn't do and could have done by using the proffer and in other ways. Didn't really clearly let the jury know that if he deviated from his fourth statement, he could be charged with perjury. And I don't think you can assume that the jury automatically knows that. They knew that the state had fronted, so to speak, the fact that the guilty plea required him to testify truthfully and that he had gotten lenience. But what they didn't know was that, and I think this could have been brought up through cross-examination, is when you say testify truthfully, you mean, you just told us that your fourth statement is the truth. Yes. So you have to testify consistently with your fourth statement. Otherwise, your plea bargain is in jeopardy, right? Well, he would pretty much have to answer yes, and if he answered no, he could be impeached on that. So what the jury didn't know is that he was, if he deviated from his fourth statement, which is the only statement in which he implicated the defendant, and really the only evidence that puts her on the scene at the time of the incident, that he had a lot, he had something to gain because he had a lot to lose. He could have faced perjury charges, but I think more important than that, he could have lost the benefit of his plea bargain, where he went from a possible maximum of 60 years to a cap of 35 years. And although the jury was never informed of this, the record does show that, in fact, he got sentences of 10 and 10, so he got an aggregate sentence of 20 years. Had he been sentenced by the time that he testified, or was that still open? Yes. So how much time had passed? About 10 years, frankly, because- Or from the time he pled until the time he testified. About 10 years, because of the post-conviction. In the interim, what happened was- Right. We know that. Yeah, okay. So that's why it took so long for him to testify, because originally Ms. Rogers had pled guilty. So how were they going to go back and get him 10 years later on the earlier plea? If it's a term of the plea and he breaches it, I think it's not unprecedented for the state to at least try to vacate the plea and say, part of his plea will be testified truthfully. We find the truth. When he signed the fourth statement, he said it was the truth. Look at his testimony. Look at the fourth statement. They deviate. In the fourth statement, he said, the defendant was with me. In fact, she was the one wielding the hammer. He testified, oh no, that wasn't true. I just said that because I was trying to get a favorable plea bargain. She wasn't with me. It was Robin. The state could say, you breached your plea agreement, Mr. McMeekin, or at least he could subjectively believe that. The defense counsel didn't even probe that to see what his state of mind was. And I think, frankly, even if he had denied that, if he said that he wasn't afraid of it, that provides a basis, a stronger basis for when the state makes the claim in closing argument, Mr. McMeekin has nothing to gain by lying. You can object. And the jury has heard the evidentiary foundation that shows why that's objectionable. And you can also, in your defense argument, say, here's why he has something to gain by lying. You could have explained that very clearly to the jury. But was that the second instance of ineffective assistance as you've discussed it? Well, that concerns – the state used the testimony of Rick Rogers describing the details of what happened during the incident itself to corroborate McMeekin's testimony, essentially saying, how do you – are you going to tell me the truth about what happened? Because look at all the parts that mesh with what Rick told you. Now, because of a discovery violation, the trial judge had prohibited the state from using Rick's testimony describing the incident in any way. And I think the state even admitted in their briefs that this violated that order. And the state argues instead that this was a reasonable decision by counsel not to object because the comments were brief and not want to call attention to Rick's testimony. The problem with that is it's illogical. The horse is already out of the barn. It doesn't make sense to say it's reasonable not to object to an improper comment drawing attention to testimony when the comment drew attention to the testimony. That's what you're trying to prevent is the jury from taking that into account. So those two things together, I think, prejudice the defense. Does the court's general admonition cure that? General admonition? As far as closing arguments are in evidence and so forth. What these lawyers tell you, don't pay any attention to. It's not evidence. Does it cure the second? Does it cure that error? The second admonition? Yes. I don't think so, because although they're told it's not evidence, it's still argument, and it's to be considered by the jury. The purpose of argument is to persuade the jury to believe one side or the other. And what the state did is something they were prohibited from doing, which is use a portion of the testimony to corroborate its star witness. Mr. McMeekin was the star of the show. I don't think anybody can deny that. And anything that bolstered his credibility was crucial and was harmful, very harmful to defense. I think to the point where it does raise to the level of prejudice under Strickland. And the second admission, as I said, essentially allowed the state to persuade the jury, you should believe McMeekin because he lines up exactly with what Rick told you. So I don't think the general admonition, it tells the jury that that's not evidence, but it doesn't tell them that's not persuasive argument. And oh, by the way, they weren't even supposed to refer to that. So if there aren't any other questions about that first issue. So your position in the brief is that 554 applies. Yes. And tell me why. Because of its plain language. And it says that if a conviction is set aside on direct appeal or on collateral attack. The sentence that was imposed on prior conviction, previously imposed sentence cannot be increased unless it's based on comment that occurred subsequent to the original sentencing. So here we have. What does collateral attack mean? Well, it means exactly what it says. And a post conviction petition is a collateral attack. And I want to say it's the Harris case, but I know I cited a case in the brief that says, and I think it's almost black letter law, that a post conviction petition is a collateral attack. The statute does not say that it has to be set aside on collateral attack by a reviewing court. It's set aside on direct review or on collateral attack. That's what a number of cases, though, have apparently, the way they've interpreted it, correct? They've applied it in that situation. They've used that language. But I think, and I would guess that Your Honor might be referring to the concurring opinion that Justice Zinoff wrote and even the majority opinion in Strawbridge where it's, the statute is discussed as though it only applies if the conviction has been set aside by a reviewing court. And to support that interpretation, Justice Zinoff referred to the counsel commentary. But you can't refer to the counsel commentary where the language of the statute itself is plain. Nothing in the statute says that it applies only where a reviewing court sets aside the conviction. The legislature presumably knows how to say what it means. And it didn't say that. And there's a big difference between saying if a conviction is set aside on direct appeal or on collateral attack and saying if a conviction is set aside on direct review or on collateral attack, or by a reviewing court on collateral attack, those are two very different statements. So I think if you just take the language of the statute and apply it to the facts, the more than 50% increase in the sentence here from 30 years to 46 years violates the statute. And I would say, just in conclusion. I do have a question. Why can't we look at the fact that it appears by timing that 554 is in direct response to North Carolina versus Pierce, time-wise. And North Carolina versus Pierce was a trial and a trial. Right. For whatever reason, they added or collateral attack. Right. Why can't we consider the evil that was, and it's called an evil again in those counsel commentaries. The evil that was intended to be dealt with because of the North Carolina versus Pierce in the constitutional argument when we look at the statutory authority. Because when we look at hierarchy, United States Supreme Court, Illinois Supreme Court, Illinois Supreme Court rule, statute. That's kind of the way we apply things. Why can't we consider that? Because the canon of statutory construction is that you start with a plain language of the statute. What if we don't even get there because we go through the other, the higher, the common law? Well. That it was designed to deal with. I'm sorry. Go ahead. North Carolina versus Pierce sets a floor, a constitutional floor. A due process prohibits an increase in a sentence where the increase is, where first there's a trial. There's an appeal that results in a reversal in a new trial. There's a retrial and there's an increased sentence. They say then there's a presumption of indignity. That was North Carolina versus Pierce. That was North Carolina versus Pierce. And that constitutional rule, as was later held in Alabama versus Smith, does not apply where the first sentence was imposed pursuant to a guilty plea. But there is absolutely nothing to stop a state from enacting a statute that provides greater protection than the Constitution requires. In light of North Carolina versus Pierce, you wouldn't need the statute. The statute goes farther. Whether the legislature thought they were going farther or not, I don't think that a judgment this court could make if you used the standard principles of statutory construction. This isn't a matter of policy. It's not a question of what it ought to say, the statute that is. It's a question of what it does say. So I know my time is up. Would you agree that it looks to me like the Strawbridge and Pierce, which is an old first district case, support to some degree what you're saying. But there's a number of other cases, Pittman, Jackson, Miller, Adams, Gorka, that actually take a different view. All of those cases, and I think I mentioned this in the reply brief, can be distinguished. First of all, they're all before Strawbridge. And Gorka, Pittman, Miller, and Adams, the guilty bill was set aside on a motion to vacate. So it's neither in the trial court, so it is neither direct review nor collateral attack. And there's another case that the state relied on called Woolsey, which they said that the statute didn't apply. But in that situation, the initial sentence was void. It was supervision for a felony. So you don't really need to resort to the statute in that case. It's not increased. It's just imposing a legitimate sentence. So that's how I would distinguish that. Now, how do you square these cases with the line of cases, though, and the statute with the line of cases that say – then they're basically Supreme Court cases which say that a plea agreement is a contract between two parties. You vacate that. You set that aside. Everybody starts over. Everybody does start over. And I would point out that in thinking about what the positive implications are here, I know Justice McConnell uses the term windfall in saying that reading the statute as it was read in Strawbridge provides defendants simply guilty of the windfall. That may be true in some cases. But it wasn't necessarily true here because when Ms. Rogers ended her negotiating guilty plea, which was an altered plea, she didn't just get sentencing concessions. She had other charges dismissed. And so there are cases in which where part of the negotiation is as to what charges stand. There might not be an agreement on sentence at all, but there's an agreement on what charges stand. Somebody who files a post-eviction petition to vacate the guilty plea and wins that is taking a risk. And so I think that when you keep that in mind, it's not reading the statute as it is written does not really provide the kind of windfall and violent contract principles that Your Honor is talking about because the state isn't any worse off than they were. They're just limited to the sentence that they agreed to in the first place. Well, didn't they cap it? Or no, whose was capped at 35? That was the co-defendant. Ms. Rogers agreed to a sentence of 30 years. So when vacating that, why isn't that depriving the state of the bargain? Well, whether it is or it isn't, again, I would dispute that somewhat because they still are getting the benefit of that she can get 30 years for the attempt at murder. So they're getting the sentence they bargained for. She can get the sentence they bargained for on the convictions that they bargained for. But my other response to that would be you have to follow what the statute says. And if it leads to consequences that are distasteful to the court on policy grounds, that's something for the legislature to correct. And they've had four or five years, I think, since Strawbridge to amend the statute. They've not done so. So is it possible that, let's just say hypothetically, under your scenario, it's capped at 30? There are, though, additional charges which were dismissed. If you factor those in, is it possible then for her to be sentenced to additional time on those additional counts that were dismissed? If convictions were entered on those charges, which in this case they were not. Okay. So in conclusion, I would just ask this court to first reverse the conviction and amend it for a new trial with instructions to, if she's found guilty again, to adhere to Section 554A. And alternatively, even if this court doesn't agree that Ms. Rogers deserves a new trial, to reduce her sentence from the 46 years to the 30 years that was in the original plea agreement. And Mr. Rogers, although I think the court and those in this courtroom are pretty well convinced that you are not related to the defendant here, it dawns on me that we do have an audience online. Yes. And so if you'd like to state that for the record. In fact, Your Honor, I thought about doing that, and I opted not to. But I agree with you. For the record, I will say that I am in no way related to any of the Rogers who are involved in this case. Thank you very much. Thank you. All right. Ms. Burns. Did you search the family tree? No, Your Honor. It's a very long story, but I can tell you with absolute certainty. He has got to. Okay. Good afternoon, Your Honors. May it please the court, my name is Mary Beth Burns, and I represent the people of the state of Illinois. We come before you this afternoon to ask you to please affirm the conviction and sentence of the defendant. Initially, I would like to thank this court for granting my motion to reset the argument. I appreciate it very much. I had a good time in Orlando. Darn. In briefly addressing some of counsel's comments on this first issue, counsel speaks rather compellingly about defense trial counsel's failure to use the proffer that was found in the post-conviction record. However, the piece of paper that is actually there is unsigned, and it talks within the body of it of being a possible prelude to plea negotiations. I'm not entirely sure that there's anything particularly compelling to try our fact in something that is a possible prelude and is unsigned. I think instead of focusing on an unsigned piece of paper, we would ask this court to focus on counsel's really vigorous defense of her client, her really vigorous presentation of the defense that Robin, the daughter who had had the affair with the co-defendant, was in fact the actual accomplice. The significant, significant cross-examination of the co-defendant and counsel's manner of choosing what to bring to the court's attention privately and what to object to publicly. I think that when read in its entirety, counsel provided extraordinarily vigorous representation for a client who was not particularly sympathetic. And I think that trial counsel did an enormously impressive job in making the defense credible. The fact that ultimately the jury believed the co-defendant rather than the defense that Robin was the accomplice does not in any way change the fact that counsel presented a very vigorous defense. And I think this was also shown in her choice not to object to the very brief statements that may well have violated the court's order. The words that actually contested a violation are something like under 15 in closing arguments that covered 45 pages. Well, is there some rule that is out there or would you like us to consider a rule that, they said there'd be no math in this job, but now we're talking math, that we look at the number of words in the arguments and figure out what percentage and then say, well, that certainly couldn't have affected them. I mean, certainly not because I agree that we don't do math here. However, I think there is law that says that the prosecutor's comments are taken in context and we look at, the prosecutor's given great latitude and so the prosecutor's mistakes, though they may well be mistakes, are not going to be fatal unless they significantly, significantly prejudice the defendant. Here, trial counsel made what was a strategic decision not to highlight testimony that she didn't want the jury to really have a chance to think about. And so it made a lot of sense to simply let that skate rather than stop the argument at that point and focus the jury's attention on it. And so, yes, I think that what the prosecutor said was erroneous. And I think in our brief, we've got the quotes and then within the quotes, there's like underlining the parts that could be said to have violated the order. However, when counsel's listening to that and counsel understands that the last thing she wants to do at this point is highlight the victim's returning memory 10 years after the attack, I think clearly she did make a strategic decision. And I think that strategic decision does not in any way undermine what was vigorous representation. And I think that it's a problem when you're assessing counsel's performance under Strickland. You have to look at the totality of her performance. And the totality of her performance really was very careful. She brought things to the court's attention on a very consistent manner. She was the first person who did in fact object outside the presence of the jury before the jury was brought in, I think, about some of the returning memories. I think that her actions were consistently in favor of her client. She was a zealous advocate. During her closing arguments, again, her defense theory is that Robin, the teenage daughter, was the actual accomplice. And so she read in pages and pages of the daughter's diaries and letters about how much she hated her father. She consistently stayed basically on point, which was it almost doesn't matter. And again, what the trial court had said was this cuts both ways. When the victim starts to remember that there was a woman on his back, that could have been the defendant. It also could have been Robin. And so it really cuts both ways. As to the part, the next part, which was about the scuffle with McMeekin and that somebody was behind him, hitting him from behind, which could not have been McMeekin, even absent the error in talking about, and again, it's like in your words, talking about the return memory, it's still also consistent with the fact that McMeekin had scars on his neck, which would indicate that there had been a scuffle, whether the defendant had remembered it or not. Let's go back to the proffer quickly. I know what the document looked like in the record. Should counsel try to discover what might be considered a final document or any other document that related to this particular plea and the truth? I guess the problem that I have with this is the document is in the post-conviction record. I don't know that we know that it was available to any of the parties at trial. I think that my recollection, and I'm sorry it was a long time ago that I looked at the record, my recollection is that there was a discussion by one of the police officers who was involved in taking the statements. I don't know that that discussion was committed to paper, and I don't know if that was the same thing that ultimately led to this document, and I apologize, I just don't remember the record that well. It was before the jury that he had in fact changed his story, and that it was before the jury that the court would evaluate whether his testimony was consistent with what was the current version of the story. And so I think the jury, even without having been told, could have inferred itself that if he deviated his plea arrangement, whatever that may have been, might be in jeopardy. So I think that the fact that the proffer wasn't there doesn't change the fact that jurors listening to the testimony could well have inferred that he might well suffer a detriment. All right, what about 554? Do you believe it applies to this particular scenario? No, I don't, for a couple of reasons. You know, and again, we're still not happy with Strawbridge, but this is even more compelling than Strawbridge in that it was a fully negotiated plea. But the discussion I think counsel had is legitimate. Counsel is talking about black letter law, which says you don't resort to areas of construction unless the statute is in some way ambiguous. However, what you get here is an absolutely absurd result. And we have a great deal of body of, you know, significant body of law which says that the statutes are not to be construed in a manner that will lead to an absurd result. I think counsel disputes the notion that there is a windfall when one withdraws one's plea and goes to trial. However, I think that if in fact, and especially after a fully negotiated plea, the state is obligated to stick with the original agreement, that's grossly unfair. Because the agreement wasn't just that we're getting a particular sentence. The agreement is that we're being excused from putting on a trial. In this case, there was an implication, I believe maybe in sentencing, that the defendant who made this choice originally to enter what she considered an Alfred plea because she was going to save her family the problem of a trial. And ten years later, the family has the problem of the trial, the prosecution has the problem of the trial, and you have people who suffered extraordinary, extraordinary damage. The two victims in this case, when you read the sentencing, what they suffered was hideous. And to have to go through ten years later discussing it in public, and Angela Gloria especially, she talked about looking in the mirror and not seeing herself. She was bashed with apparently, all I could glean from the record is one of the small sledgehammers. Her face has been operated on multiple times. She simply doesn't look like herself. She was a scientist at Abbott Lab. She's never going to be that again. She has suffered brain damage. She has limited relationship with the children who were toddlers at the time of the attack because she required so much medical attention that she couldn't actually be with them when they were little. So what are we saying, or what are you ultimately saying, because now the trial court has information that it was not privileged to before, that that should be considered? That's certainly part of it, Your Honor. And cases like Smith, when they talk about North Carolina v. Pierce not being applicable in the guilty plea, point to that type of consideration, that after a trial, there's certainly significant more information available to the trial court than there ever was in any kind of a plea, much less in a guilty plea where here they didn't even do a pre-sentence investigation report. All right. So tell me, if you can or will, how do we take a case decided ten years or so, which would be Alabama v. Smith, and apply it to 554, which comes right after North Carolina v. Pierce? How do we do that? You know, and I guess we end up with multiple layers of conflicting black-letter law. You don't look at the statute if the statute's words are clear, but you don't construe a statute in a manner that is absurd. You trust the legislature to say in its statutes what it wants to accomplish, but you don't, as a policy matter, construe statutes in a way that will deliver windfalls. I would tell this court, honestly, I don't know what the answer to this is. I think that counsel's argument is legitimate. I think my argument's legitimate. I think that Justice Enos' concurrence in Strawbridge is also legitimate. It was an invitation to the General Assembly, which, disappointingly, it did not accept. I think legitimately also, whichever way this court goes, the losing party will be going up, because I think we're at the point now, you know, five years after Strawbridge, there does have to be a further judicial consideration of this, because where the committee comments really talk specifically about North Carolina v. Pierce, this result cannot be what they intended, because to the extent that you're looking at North Carolina v. Pierce, which is a due process case, and to the extent that the United States Supreme Court has narrowed North Carolina v. Pierce multiple times since it came down and has really emphasized over and over again, the evil isn't a greater sentence. The evil is vindictiveness. The concern is punishing a defendant for seeking review, and clearly nothing in any of our jurisprudence would tolerate punishing defendants for seeking review. In Illinois, direct appeal is constitutionally required. In Illinois, the Post-Conviction Hearing Act in 21401 and various other manners of collateral review exist, and so nobody wants to punish a defendant for seeking review. By the same token, nobody wants to reward a defendant 10 years later for a trial where you're hashing things up hideously for victims who have already suffered significantly, forcing the state to put on witnesses 10 years later when memories, in general, memories fade and here the flip side is that memories are starting to come back. What does this record say concerning or what the defendant and counsel did to establish that the trial court was vindictive? What evidence do we have? I don't think we have any evidence whatsoever that the trial court was vindictive. This issue was procedurally defaulted below. We addressed it here because in Strawbridge, this court said that a failure to properly follow 5-5-4th would constitute the creation of a possibly void sentence, and so it would be reviewable. And I guess if it's not void, it's reviewable perhaps under plain error, though I personally don't think you're looking at plain error either from counsel for not bringing the court's attention or from the court because the court said over and over again that this was a significantly different level of information than it had at the point that it imposed the original sentence or accepted the original agreement. And so there's nothing vindictive in the court saying this is not the case now that it was when this agreement was presented to me. So there's nothing in the record whatsoever that would indicate vindictiveness. Again, we made no formal waiver argument because we made that argument in Strawbridge and it was rejected, and Strawbridge specifically says the violation of the statute would lead to a void sentence, and therefore that would be reviewable. If Your Honor has no more questions. Thank you very much. Thank you. And Mr. Rogers, when you are ready and you have your bow, you may proceed. Thank you. First, I just want to say one thing about the sentencing issue. I appreciate Ms. Burns' candor about that my argument has some legitimacy. And you have that on tape. That's right. I respectfully disagree with the conclusion that this is an absurd result. It may be a result that some people would disagree with, that people would think is unwise, but it is not necessarily absurd. It is not, I don't think, a foregone conclusion that the result in Alabama v. Smith, in which Pierce was held not to apply a guilty please, I don't think that was a foregone conclusion. I don't think that the U.S. Supreme Court thought that that would be an absurd result. Well, I will say that it is one of the shortest Supreme Court decisions I have ever read. Alabama v. Smith. Yes. Where they went right to the point, they saw, or it appears they saw what the issue was, they addressed it, and they went home. And I applaud them for that, and now they have a record of that. But, you know, so they corrected something that seemed to be left open, it would appear. That's true. So they answered an open question, and they answered it very succinctly and directly. But I don't, and I'm not going to say that I recall every word in Alabama v. Smith, but I don't know that they said it would be absurd to reach a contrary conclusion. But even if they did, I don't think that would matter because, as I said before, that's a constitutional matter. That's a floor. And if the legislature thought that the interpretation that this court gave to the statute in Strawbridge was absurd, it's had plenty of time to correct that absurdity, and it hasn't done so. And from that silence you can infer acquiescence in how Strawbridge interpreted the statute. But I would like to shift attention now to the other issue, the ineffective assistance of counsel issue. And first of all, as to whether the proffer was signed or not signed or whether the signed copy was available to defense counsel, it's true. The proffer itself was not signed, the proffer that's in the record. And a proffer might be considered a contract if it was actually executed. Correct. We don't have any execution in the record. That's true. However, we do have it in the record. It's at page C349, and it follows the report by the officer who was at the, when the fourth statement was given. And the officer wrote, the original agreement, referring to the proffer agreement, was then signed and witnessed by all the required parties, and the original agreement remained in the possession of Strickland, referring to the then state's attorney, assistant state's attorney. So I think it's pretty obvious on the record that defense counsel knew or should have known that the signed copy of this was available. It had to be available. It had to be somewhere in the state's files. I mean, I guess it's possible it could have been lost, but there's no reason to assume that it was. So as far as having that on the record, that's, I don't think, an issue. And so the proffer wasn't, the trial court knew about the proffer, but the jury didn't know. Correct. Correct. I mean, assuming the trial court was, you attribute knowledge of the entire record to the trial court, whether subjectively acting, you know, really realized it put two and two together, I don't know. And Judge Phillips was, took the plea back in 2002, 2003, and then did the trial in 2013. That's right. And he also, also a copy of the, I mean, Wiegand's guilty plea hearing was in the record, too. And I know that Judge Phillips knew that. Was there no mention made in any testimony of the proffer? No. Okay. Not that I recall. I mean, if there is, then there is. I'm wrong about the record, but I don't recall it being, not in front of the jury, I'd put it that way. I think there was maybe, there may have been some conversation about it in some of the pretrial proceedings, but I don't think that the jury ever heard about it that knew that there was such a thing. The other point I want to make about the ineffectiveness is that, is a point that I made in a reply brief, and the State has made the same argument here that it made in its brief, and that is that, well, don't worry about what counsel didn't do. Look what she did. Look at the great job that she did. She did, you know, she was really vigorous, cross-examination, was very zealous. And I would, I would agree with that. But I would say it doesn't matter. It doesn't necessarily matter. This is not a crime case where you're talking about a virtual absence of counsel, failure to represent at all. You're talking about Strickland, which is ineffective assistance, and that requires you to look at particular acts and omissions and decide if those prejudiced the defendant. And I would say that while the first omission here was more prejudicial than the second, the second contributed to the prejudice, and that's sufficient for it to count under Strickland. You can look at both of them together and accumulate the prejudice. And when you talk the first and the second, you're talking about how you have dealt with it in your brief. Yes, right. I wanted to be sure we were. Right, yeah. The failure to show that and being at a bias as being the first and the second being the not objecting to the comment. Well, they heard a lot of other evidence about, they, the jury, I beg your pardon, heard a lot of other evidence about the relationship between Mr. McMeekin and Sandra Rogers, Mr. McMeekin and I guess it would be Robin Rogers. Yes. They had a lot of other evidence by which they could look at this witness and say, I don't believe him or I do believe him. I mean, how do, how would he, we use the reasonable, you know, we have other evidence. So, and we have him acknowledging he's a liar. How is the proffer going to really change that issue? I agree that the state, that the jury had a lot of evidence showing that McMeekin was not the most reliable witness in the world and that he had changed his story. Ms. Burns talked about the change of story and that the jury knew that he had changed his story, but what they didn't have because they never heard about the proffer and it was never driven home through cross-examination or in another way through other witnesses, that he had a motive to change his story from the first three statements in which he said I acted alone to the fourth story in which he said, oh, no, Sandra was with me. That's what was prejudicial. That's what didn't happen here. If the jury had known that, it's basically, it's the estimation of McMeekin's credibility, how believable he is. The more believable he is, the less believable the defense theory is and vice versa. So anything you can do that takes away from McMeekin's credibility makes it more likely, and I think in this case reasonably likely, that the outcome might have been different, that the jury would have said, boy, you know, if we had known that McMeekin could have been charged with perjury if he deviated from that fourth statement, and if we had known that he could have lost his guilty plea and faced up to 60 years, that's a pretty powerful belief. If that was me, I'd just stick with the fourth statement. Anybody's right mind would do that. I'm not going to risk taking more time for Sandra when I've already locked myself into this statement. And I think that's the practical common sense way of looking at it, and that argument was never presented because the evidentiary foundation was never really laid, and there was no opportunity to do that. I'm not saying that Ms. Goss is a terrible lawyer, that she did a terrible job, you know, overall. If she had, I would have mentioned other things that she did wrong. But I think what she didn't do, the two things that I've identified, are sufficient to show that she wasn't effective and that Ms. Rogers deserves a new trial. Thank you. We'll share our discussion with Justice Enoch when she's able, and we will deliver a decision in due course. We appreciate your appearance here and your argument, and we will now stand adjourned.